IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD K. HAGEN,                         :
    Plaintiff/Counter-Defendant       :
                                      :
    v.                                :        CIV. NO. AMD 05-1040
                                      :
UNITED STATES OF AMERICA,                 :
    Defendant/Counter-Plaintiff       :

...o0o...

MEMORANDUM OPINION

Plaintiff Richard K. Hagen filed this tax refund action after paying a portion of the amount allegedly due under a trust fund recovery penalty for unpaid payroll withholding taxes for American Quantum Cycles, Inc. ("Quantum") assessed against him pursuant to 26 U.S.C. §6672. The government counterclaimed for a total of $274,918 in unpaid assessments, penalties and interest for the fourth quarter of 1999 and the third quarter of 2000. Now pending are the parties' cross motions for summary judgment. The motions have been fully briefed and no hearing is necessary. For the reasons set forth, judgment shall be entered in favor of the government.

I.

The parties agree on almost all the facts. After acting as consultants for Quantum, which was an enterprise involved in the motorcycle industry, Hagen and Gary Irving eventually joined the company in 1998 as CEO/Board Chairman and President/Chief Operating Officer, respectively. Linda Condon ("Condon") was a bookkeeper/accountant a the company, having been hired a few months before Hagen and Irving came on board.

Together, these three employees managed the company: Hagen had overall authority, including raising capital and hiring; Irving was responsible for manufacturing, production, and business development; and Condon handled the accounting, payroll, and banking functions.

In early 1999, Condon alerted Hagen and Irving that the company had not paid payroll withholding taxes to the Internal Revenue Service ("IRS"). An IRS officer visited Quantum to interview Hagen and to discuss a payment plan for the outstanding taxes. As CEO, Hagen took the initiative to raise the capital to pay the overdue taxes. The company eventually paid all taxes from this early period.

In late 1999 and early 2000, Condon periodically supplied Hagen, who was often on the road, with spreadsheets detailing Quantum's financial situation. During this period, Hagen learned that Quantum had again lapsed into delinquency in paying payroll taxes. Hagen and Condon spent a considerable amount of time discussing company funds, with Hagen insisting above all that Condon ensure that employees were paid so that the company would have merchandise to sell.

As with the first period of delinquency, Hagen took the lead in trying to raise funds to pay the IRS. This time, however, Hagen was unable to raise the funds. Quantum was in dire straits; Hagen could not bring in enough investment money to recover from debts. Quantum was forced to seek a merger with another motorcycle company, but this merger ultimately failed. Hagen left the company in October 2000.

II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits be made "on personal knowledge," that the facts they set forth are admissible in evidence and that the affiant is competent to testify. Fed. R. Civ. P. 56(e). This rule is founded upon Rule 602 of the Federal Rules of Evidence, which bars from admissibility any testimony to which the affiant has no personal knowledge. Fed. R. Evidence 602. Testimony made without personal knowledge is likely hearsay, and unless the testimony falls under an exception, it is inadmissible.

Hagen asserts that certain portions of Irving's testimony are inadmissible for lack of personal knowledge and thus, cannot be used as a basis for determining whether summary judgment is warranted. Irving admitted that he had no personal knowledge of whether Hagen signed signature cards for bank accounts. Irving also admitted that he lacked personal knowledge that Condon was instructed not to pay employment taxes. Irving's lack of personal knowledge means that his testimony on these issues, shall not be considered in my examination of the pending motions. *See, e.g.*, *Greensboro Pro'l Fire Fighters Ass'n v. Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995); Fed. R. Civ. P. 56(e). Nevertheless, the remaining portions of Irving's testimony are clearly admissible. For example, Irving had

personal knowledge of the fact that Hagen was chairman and CEO of Quantum and the duties Hagen's employment entailed. As chairman and CEO of Quantum, Hagen had power to "periodically dive anywhere and say do it this way." *Irving Dep*. at 91:5-6. Irving also had personal knowledge that Hagen was regularly briefed on all aspects of company, including the finances. *Id*. at 91:8-10. The "finances" included "the raising of money, the banking relationship through, you know, Linda Condon, all the tax things." *Id*. at 91: 12-15. In short, those portions of Irving's testimony that relate to the corporate structure or everyday governance of the company are clearly admissible.

Similarly, Condon's testimony regarding whether Hagen ever signed any Quantum checks is inadmissible because it relates to written instruments that have not been produced by either party. Accordingly, pursuant  to F.R.E. 1002, to prove the content of a writing, recording or photograph (i.e., Hagen's signature on the checks) requires the original writing, recording or photograph. Nevertheless, Condon's testimony regarding Hagen's *authority* to sign Quantum checks is a different matter. Such testimony is undoubtedly admissible. Condon was Quantum's Financial Director and Hagen admits that Condon "was responsible for most financial matters, including all matters relating to payroll, from writing checks to maintaining the tax returns to filing and paying all payroll taxes." Condon's title and responsibilities evidence her personal knowledge as to who had authority to sign checks or not, who had power to disburse funds, and who decided when payments would be made. After all, these tasks were part of her normal day-to-day responsibilities.  In short, there can

-4-

be no dispute that the portions of Condon's testimony relating to the corporate structure and management of corporate finances are admissible.

III.

A.

The relevant statute, 26 U.S.C. § 6672(a), provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Courts have uniformly interpreted this provision to mean that a person "can be liable under section 6672(a) only if (1) he is a 'responsible person' under a duty to collect, account for, and pay over trust fund taxes, and (2) he willfully fails to discharge his duties as a responsible person." *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992).

A party is not presumed to be a responsible party merely because of his title. *O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir. 1992). This rule stems from a recognition of certain business realities – particularly, that most corporate officers do not have the authority make disbursements or to make day-to-day decisions in running their companies. *Id*. The Fourth Circuit has stated that, in determining responsibility under §6672, the "crucial inquiry [is] whether the person had the effective power to pay taxes – that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay taxes owed." *Plett v. United States*, 185 F.3d 216, 219 (4th Cir. 1999) (quoting

-5-

*Barnett v. I.R.S.*, 988 F.2d 1449, 1445 (5th Cir. 1993)).  The *Plett* Court also listed a number

of factors that are "indicia of the requisite authority." *Id*. These factors include "whether the

employee (1) served as an officer of the company or as a member of its board of directors;

(2) controlled the company's payroll; (3) determined which creditors to pay and when to pay

them; (4) participated in the day-to-day management of the corporation; (5) possessed the

power to write checks; and (6) had the ability to hire and fire employees." *Id*. This multi-

factor test contemplates that the responsible person must have significant control over the

corporation's finances; however, *exclusive control* is not necessary.  *Greenberg v. United

States*, 46 F.3d 239, 243 (3d Cir. 1994).

　　The *Plett* factors must be evaluated together; no single factor is dispositive or

determinative of authority. *Barnett*, 46 F.2d at 1455. The "responsible person" is not limited

to one person in a corporation; rather, there may be multiple people who qualify as

"responsible persons." *Plett*, 185 F.3d at 219. Further, §6672 applies to all responsible

persons, and not just *the most responsible* person.  *Turnbull v. United States*, 929 F.2d 173,

178 (5th Cir. 1991).

## B.

　　Hagen, who argues strenuously that only Irving and/or Condon are responsible

persons for the Quantum deficiency, is, as a matter of law, a "responsible person" under

§6672. He was Quantum's CEO and Board Chairman.  In addition, Hagen directed the other

Quantum management employees, Irving and Condon, as to what bills to pay and how to pay

them. Hagen himself admitted that he gave instructions as to how payroll and other expenses

should be handled after the taxes for the first quarter of 1999 were not paid:

> Q.     And when [Condon] was [handling tax matters] – so the first quarter
>        that was due in 1999 for which it wasn't paid, she didn't tell you then
>        that she didn't pay taxes?
>
> A.     When I would look – you know, it was monthly, then when we got into
>        problems it became a weekly thing. A lot of times it was via phone
>        because I was not there. And my instructions to Gary on subsequent,
>        and thus to [Condon], was payroll is paramount . . . Secondly, we had
>        to have a facility to operate in. *So pay the bills we have to pay to keep
>        lights on and so we have someplace to manufacture the bikes.*

*Hagen Dep.* 23:16-21-24:1-17 (emphasis added). This testimony reveals that Hagen

controlled the management of company's payroll and that he determined which creditors to

pay and when to pay them. "[A] person has significant control if he has the final or

significant word over which bills or creditors get paid." *Quattrone Accountants, Inc. v.

United States*, 895 F.2d 921, 927 (3d Cir. 1990). Such control is a strong indication that

Hagen is a responsible person.

    Furthermore, Hagen was heavily involved in the day-to-day management of the

corporation.  In answering the deposition question above, Hagen went on to describe Irving's

management of the technical aspects of the corporation– namely, Irving's ordering the

necessary parts for the motorcycles. Whenever those decisions were changed, however,

Hagen was immediately notified: "I needed to know because every time we had a change,

I might have to talk to 15 or 20 different entities to alert them that we were not going to be

able to meet our forecast and explain the reason why."  *Hagen Dep.* 25:3-7.

Condon also testified to Hagen's involvement and participation in Quantum's day-to-day management. According to Condon, even though Hagen spent a great deal of time outside of the office to raise funds, he kept constant tabs on the finances of the company, including the taxes:

> Q.    What did [Hagen] do to run the company or grow the company?
>
> A.    A whole lot of time was spent out of the office. A lot of it was investor – meeting with investors, trying to line up, promote the company, those kinds of things. But he was on the phone a million times a day with every one of us. And so – I mean, he stayed – it was as though he was there. So he stayed, really, on top of everything that was going on and would issue instructions, you know, what bills to pay. I faxed a lot of stuff back and forth to him and e-mailed him. I did these sheets almost daily, sometimes – not daily – sometimes I'd skip a day or two. But I would send him these spreadsheets that would, kind of, show bank balances and what checks were outstanding and what payables were coming due as there were note payments, loans coming due, any outstanding liabilities that were of particular note, like payroll taxes, those kinds of things. Then he would tell me, go ahead and pay this, you know, or hold this one off, that kind of thing. I didn't have authorization to issue checks on my own right.

*Condon Depo*. at 16:16-25-17:1-12.

As discussed above, Condon's testimony regarding Hagen's ability to write checks is admissible. Indeed, Condon testified that although Hagen never physically signed any checks, he had the power, as Quantum's CEO, to tell Condon which checks to issue. *Condon Dep*. 35:24-25.

In his deposition testimony, Hagen alluded to his ability to hire and fire employees. He claimed to have hired Gary Irving as Chief of Operations: "[A]nd that was the reason

why I asked Gary to come on board, he was good at running the details of the business."
*Hagen Dep*. 13:3-6.  Hagen also cited the lack of funds as the main reason why he did not
hire employees to help Condon when she was struggling in her position. Plainly, Hagen had
the power to hire and fire; Hagen and Irving did exercise their power to hire employees when
they appointed an assistant for Condon.

To avoid liability, Hagen cites *Godfrey v. United States*, 748 F.2d 1568 (9th Cir.
1984) (holding that a Chairman of the Board of Directors of Career Academies, Inc., was not
a "responsible person" pursuant to 26 U.S.C. §6672, and was therefore not personally liable
for the company's failure to pay withholding taxes to the IRS). Manifestly, the undisputed
facts of the instant case are easily distinguishable from the facts in *Godfrey*. Notwithstanding
the fact that Hagen and Godfrey had similar titles ("Chairman of the Board"), their actual
roles in their companies are completely different.  It is undisputed that Hagen was a
Quantum employee, and that he eventually rose to become CEO and Board Chairman of the
company. He was hired specifically to head up Quantum because the founders did not have
the necessary corporate background.  In sharp contrast, Godfrey was simply an outside
director of Career Academies, Inc. Godfrey was a partner at Godfrey and Kahn, S.C., a law
firm in Milwaukee. *Godfrey*, 748 F.2d at 1571.  He accepted chairmanship of Career
Academies, Inc., only to provide consultation and advice. He did not receive a salary and
was "not officed at any Career facility." *Id*.

Moreover, Hagen had administrative and managerial  control over Quantum in such

a way that Godfrey did not.  As previously discussed, Hagen had authority (and he used that authority) to direct Irving and Condon to make certain that the payroll was properly maintained ("payroll is paramount") and that the utilities were paid ("pay the bills we have to pay to keep the light on"). He also had authority to issue checks. And even though Quantum checks bear Condon's signature and not Hagen's, Hagen is not immunized from being a responsible person within the ambit of § 6672 because "[t]he mechanical duties of signing checks and preparing tax returns are … not determinative of liability." *Godfrey*, 785 F.2d  at 1575. Godfrey, on the other hand, did not have any authority to govern or oversee daily activities. Although he took the lead in attempting to prevent the business's insolvency and tried to alleviate its financial hardships, he did not have an everyday duty to run the company.

　　　*Godfrey* specifically spells out the rationale for its holding:

> In no case has an outside director of a publicly held corporation, who neither signed nor had authority to sign checks, who did not participate in the day-to-day fiscal management of the corporation, who did not control the payroll, who did not determine which creditors would be paid and which would not . . . had been held a "responsible person" under §6672.

*Id*. at 1576. Simply stated, Godfrey was held not liable for the same reasons that Hagen should be.

## C.

　　　Liability arises only from a "willful" violation. The Fourth Circuit has stated that "willfulness," as defined by §6672, means actual or constructive knowledge that taxes were

unpaid. *Turpin*, 970 F.2d at 1347.  Specifically, "the failure to pay trust fund taxes cannot be willful unless there is either 'knowledge of nonpayment or reckless disregard of whether the payments were being made.'" *Id.*, quoting *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976). One way in which willfulness may be established is to show that the responsible person made a "voluntary, conscious and intentional decision to prefer other creditors over the Government." *Greenberg*, 46 F.3d at 244. "One who is a responsible person when taxes were incurred [by the business], and who only later becomes aware that they were not paid, acts willfully by then paying other creditors in preference to the United States, even if money specifically withheld has been dissipated." *United States v. Vespe*, 868 F.2d 1328, 1335 (3d Cir. 1989) (affirming a jury verdict of willfulness based on the defendant's preference to other creditors before the IRS when he either knew the taxes for that period had not been paid or at least acted with reckless disregard for whether they had been paid). "It is no defense that the corporation was in financial distress and that the funds were spent to keep the corporation in business with the expectation that sufficient revenue would later become available to pay the United States." *Greenberg*, 46 F.3d at 244.

Even assuming Hagen may not have known about the second wave of tax deficiencies until late July to early August 2000, his actions subsequent to that period are compelling indicia of willfulness and supports the resolution of that issue as a matter of law. As disclosed in his deposition, Hagen learned of the tax deficiencies prior to instructing Condon as to which bills were to be paid, and in what order. Hagen called Condon on a weekly basis

to tell her the priorities for bill payment– first was payroll, followed by "the bills we have to pay to keep the lights on," and purchases of parts and supplies for the motorcycles. *Hagen Dep.* 24:2-25:1. The record contains all of the checks written in or after late July 2000. These checks are all made out to various creditors– not one of them was issued to the United States for unpaid payroll taxes.[*] It is undisputed that, after learning of the company's tax deficiencies, Hagen tried to raise funds to pay the taxes. *Hagen Dep.* 2:17-20. These attempts to alleviate the tax problems, while valiant, nonetheless proved futile, and the tax deficiency was never corrected, while other bills were being paid. Therefore, notwithstanding the inadmissibility of the direct testimony of Irving and Condon regarding Hagen's liability (the "smoking gun"), there exists more than sufficient admissible evidence that Hagen acted willfully because, as a matter of law, the record shows he learned of extant tax deficiencies but paid other creditors while still trying to raise money for the outstanding taxes.

It is also worthwhile to note that Hagen himself raised funds to pay the first wave of the company's tax deficiencies. At the very least, as the CEO with administrative and fiscal control over the company, Hagen should have been on notice that tax liability may be a problem again in the future and that it was imperative to rectify delinquency. After all, "the government cannot be made an unwilling partner in a floundering business." *Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir. 1987). Hagen's acts and omissions evidence,

---

[*]Hagen argues that his liability for the third quarter of 2000 must be limited to the amount of "preferences" reflected in the checks in the record, about $81,000. However, Hagen cites no authority for the proposition that the government's recovery can be limited in such a manner and I am not aware of any. Accordingly, the suggestion is rejected.

as a matter of law, such "recklessness" as will not permit him to escape liability under §6672.

## IV.

Because Hagen is a responsible person under §6672 and he willfully failed to pay withheld taxes to the IRS, the motion of the United States for summary judgment shall be granted and Hagen's motion shall be denied.

Filed: April 30, 2007

_____/s/_____
Andre M. Davis
United States District Judge
